CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 27 2012

JULIA A DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **ROBERT EDWARD LEE SHELL,** | ) | **CASE NO. 7:11CV00363** |
| | ) | |
| **Petitioner,** | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **HAROLD CLARKE, DIRECTOR,** | ) | **By: Glen E. Conrad** |
| | ) | **Chief United States District Judge** |
| **Respondent.** | ) | |

Robert Edward Lee Shell, a Virginia inmate proceeding pro se, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Shell challenges the validity of his confinement pursuant to the 2007 judgment of the Circuit Court of the City of Radford convicting him of involuntary manslaughter and other offenses, related to the June 2003 death of Marion Franklin. After careful review of the parties' submissions and the state court records, the court grants respondent's motion to dismiss.

## I

Shell's criminal trial in the Circuit Court of the City of Radford occurred on August 20-31, 2007, after petitioner pleaded not guilty to felony homicide, two counts of attempted animate object sexual penetration, attempted forcible sodomy, two counts of distribution of a Schedule II drug (morphine), possession of a Schedule II drug (morphine), distribution of a Schedule IV drug (diazepam), and three counts of defiling a dead human body. Before submitting the case to the jury, the Court dismissed the three counts of defiling a dead human body, and the jury found Shell guilty of involuntary manslaughter, two counts of attempted animate object sexual penetration, attempted forcible sodomy, two counts of distribution of morphine, possession of

morphine, and distribution of diazepam.  On October 26, 2007, the Court sentenced Shell to a total of 32 years and six months in prison.

Shell appealed on three grounds:  (1) trial court error in denying the motion to dismiss all charges based on the Commonwealth's failure to preserve evidence; (2) trial court error in denying the motion to suppress evidence from the morphine bottle, camera, and computer hard drives because of the unproven chain of custody; and (3) trial court error in denying the motion to suppress the forensic toxicology report due to destroyed laboratory samples.  The Court of Appeals of Virginia refused Shell's appeal on October 29, 2008, and petition for rehearing on January 27, 2009.  Shell then appealed to the Supreme Court of Virginia, which refused his petition on June 25, 2009, and denied his petition for rehearing on September 25, 2009.

Shell filed a petition for a writ of habeas corpus in the Supreme Court of Virginia on August 16, 2010.  The Court dismissed the petition on April 1, 2011, and denied Shell's petition for rehearing on June 16, 2011.

Shell then filed his initial federal <u>habeas</u> petition in July 2011.  Shell alleged the following claims for relief under § 2254:

1.  The Court allowed the Commonwealth to admit a certificate of analysis without the testimony of the lab technician in violation of petitioner's right to confrontation.

2.  The medical examiner, per office policy, destroyed six prescription bottles and their contents before trial without analyzing them and without notifying the Court or the parties.

3.  The Commonwealth failed to preserve autopsy samples for court-ordered independent testing, and the Court should have suppressed the toxicology report.

4.  The Commonwealth committed a discovery violation with respect to which member of the rescue squad arrived first on the crime scene.

2

5.      Evidence seized during the June 3, 2003 warrantless search of Marion Franklin's apartment should have been suppressed, because the search was unreasonable and police record keeping of seized items made it impossible to say definitively which items came from that location.

6.      The indictments were defective and duplicative, because the Commonwealth committed fraud before the grand jury.

7.      It was impossible for petitioner to commit sexual crimes with a corpse.

8.      Petitioner's counsel was ineffective by:

    a.     Citing incorrect statutes in the appellate brief;

    b.     Failing to "notice that lab technician Vickie Miller had never testified or been cross examined"; and

    c.     Failing to raise Claims 5, 6, and 7 at trial and on appeal.

9.      Cumulative error requires reversal.

10.     Petitioner was convicted of involuntary manslaughter, an offense for which he was not indicted, and counsel was ineffective in failing to raise this issue on appeal.

After the court granted Shell's request for leave to amend his § 2254 petition, Shell alleged the following additional claims:

11.     The Virginia Department of Corrections ("VDOC") and the Rules of the Supreme Court of Virginia deprived petitioner of access to documents from his case, in violation of his right to access the court.

12.     The medical expert's evidence was insufficient to prove petitioner guilty of involuntary manslaughter and the sexual offenses, and petitioner is actually innocent of the sexual offenses, because the Commonwealth did not establish that the victim was dead at the time of those offenses.

13.     The Commonwealth altered digital evidence in violation of petitioner's right to confrontation, due process, and right to present evidence.

14.     An indictment for distribution of drugs was defective in failing to identify the recipient.

3

15. The Court erred by allowing the Commonwealth to present corrupted, meaningless evidence.[1]

16. The evidence was insufficient to prove that petitioner was guilty of the sexual offenses.

17. Petitioner was deprived of his right to a speedy trial.

18. The Commonwealth was guilty of discovery violations.

Respondent filed a second motion to dismiss, to which Shell responded, making the matter ripe for disposition.[2]

## II

### A. Exhaustion

Absent a valid excuse, a state prisoner must have exhausted his state court remedies before seeking habeas corpus relief in federal court. 28 U.S.C. § 2254(b); Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998). Specifically, a petitioner "must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." Anderson v. Harless, 459 U.S. 4, 6 (1982) (quoting Picard v. Connor, 404 U.S. 270, 275, 277-78 (1971)). "It is not enough that all the facts necessary to support the federal claim were before the state courts . . . or that a somewhat similar state-law claim was made." Id. (omitting citations). "The burden of proving that a claim is exhausted lies with the habeas petitioner." Breard, 134 F.3d at 619 (omitting citations).

The parties agree that Shell exhausted Claims 1, 2, 3, 5, 6, 7, 9, 13, 14, 15, 17, and 18 by presenting them to the Supreme Court of Virginia via his state habeas corpus petition or petition

---

[1] Both Claims 13 and 15 appear to relate to state habeas claim 16, which challenged the evidentiary value of the digital images recovered from petitioner's camera.

[2] Respondent's second motion to dismiss addresses petitioner's additional allegations (Claims 11-18) but is otherwise identical to the first motion to dismiss. Therefore, the court will dismiss the first motion (ECF No. 8) as moot.

4

to appeal the Court of Appeals of Virginia's order affirming Shell's convictions. Shell acknowledges that he did not exhaust Claims 8(b)-(c), 10, 11, 12, and 16. However, the parties disagree whether Shell exhausted Claim 4 and Claim 8(a). After reviewing the state court record, the court finds that Shell did not exhaust Claim 4 but did exhaust Claim 8(a).

### 1. Claim 4.

Claim 4 in the federal petition alleges that the Commonwealth committed a discovery violation and proffered false testimony about the identity of the Emergency Medical Services ("EMS") technician who first reported to the scene after Shell's 911 call and these due process violations qualify as newly discovered evidence.[3] Claim 4 is related to, but based on a different legal theory than, two claims discussed in the state <u>habeas</u> petition. State <u>habeas</u> claim 7 alleged that the Commonwealth was negligent for not contacting or interviewing Austin Wickline about the victim's condition when Wickline first arrived. State <u>habeas</u> claim 7 did not allege that the Commonwealth knew of Wickline's identity or relevance to Shell's trial or knowingly proffered false testimony. State <u>habeas</u> claim 19 alleged that the Commonwealth failed to timely disclose who its agents interviewed about the victim's death, but on that claim, Shell did not discuss Wickline or Harless. Accordingly, Shell did not properly exhaust Claim 4 because he did not present the same facts and legal theories about discovery of Wickline's and Harless' identities to the Supreme Court of Virginia that he now presents in Claim 4. <u>See</u> <u>Picard</u>, 404 U.S. at 275-76 (finding <u>habeas</u> claim unexhausted where petitioner failed to present same alleged "constitutional defect" to state courts that he asserted in federal <u>habeas</u> petition).

---

[3] Shell says Austin Wickline was the first responder, but Jeff Harless, a witness for the Commonwealth, testified that he was the first responder.

5

## 2. Claim 8(a).

Shell argued in state <u>habeas</u> claim 21(e) that counsel's failure to maintain communication violated the Sixth Amendment because Shell was unable to inform counsel about a Legal Opinion from the Attorney General of Virginia and Virginia Code § 19.2-270.4:1 and § 19.2-327.1. The Supreme Court of Virginia addressed this claim on the merits, finding that Shell did not state a Sixth Amendment violation because, <u>inter alia</u>, the selection of appellate issues is left to the discretion of counsel. Shell argues in federal <u>habeas</u> Claim 8(a) that counsel was ineffective for citing the wrong statutes in the appellate brief instead of the Legal Opinion from the Attorney General of Virginia and Virginia Code § 19.2-270.4:1 and § 19.2-327.1. Accordingly, Shell fairly presented to the Supreme Court of Virginia the substance of the Sixth Amendment claim about the Legal Opinion and the wrong statutes.

## B. Procedural Default

"If a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." <u>Breard</u>, 134 F.3d at 619 (citing <u>Coleman v. Thompson</u>, 501 U.S. 722, 731-32 (1991)). A petitioner's claims are also procedurally barred from federal <u>habeas</u> review when he did not fairly present the claims to the state courts and "a state procedural rule would bar consideration if the claim was later presented to the state court[.]" <u>Matthews v. Evatt</u>, 105 F.3d 907, 911 (4th Cir. 1997), <u>overruled on other grounds by United States v. Barnette</u>, 644 F.3d 192 (4th Cir. 2011). A state court's application of a procedural bar is a finding of fact entitled to the presumption of correctness. 28 U.S.C. § 2254(d); <u>Stockton v. Murray</u>, 41 F.3d 920, 924 (4th Cir. 1994).

6

### 1. Claims 4, 8(b)-(c), 10-12, and 16

"A claim that has not been presented to the highest state court nevertheless may be treated as exhausted if it is clear that the claim would be procedurally barred under state law if the petitioner attempted to present it to the state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000) (citing Gray v. Netherland, 518 U.S. 152, 161 (1996)). Consequently, unexhausted Claims 4, 8(b)-(c), 10, 11, 12, and 16 are procedurally defaulted because state courts would summarily dismiss these claims as successive if Shell now presented them to state courts. See Va. Code Ann. § 8.01-654(B)(2) (barring a second or subsequent habeas claim based on facts known to the petitioner at the time of filing a prior state habeas petition). Shell fails to establish that Claims 4, 8(b)-(c), 10, 11, 12, and 16 are based on facts not known to him at the time of his previous state habeas petition, and thus, Shell procedurally defaulted Claims 4, 8(b)-(c), 10, 11, 12, and 16.

### 2. Claims 1, 5-7, 13-15, and 17-18

The Supreme Court of Virginia explicitly dismissed Claims 1, 5, 6, 7, 13, 14, 15, 17, and 18 as procedurally barred by Slayton v. Parrigan, 215 Va. 27, 30, 205 S.E.2d 680, 682 (1974). Slayton held that "[a] prisoner is not entitled to use habeas corpus [to litigate issues that] . . . . could have been raised and adjudicated at petitioner's trial and upon . . . appeal to th[e] [Supreme Court of Virginia]. . . . ." 215 Va. at 30, 205 S.E.2d at 682. The Fourth Circuit has upheld Slayton as "a valid state procedural rule, independent of the federal question and adequate to support the judgment" so as to bar federal review of claims. Royal v. Taylor, 188 F.3d 239, 245 (4th Cir. 1999) (citing Smith v. Murray, 477 U.S. 527, 533-39 (1986)).

Shell contends that because he presented the issues in Claims 13 and 15 to the Supreme Court of Virginia on appeal, these claims are not procedurally barred from federal review as the

respondent argues. The court cannot agree. State <u>habeas</u> claim 16 (which is the same as Claims 13 and 15 <u>sub judice</u>) argued that the altered digital evidence had no evidentiary value and was highly prejudicial, in violation of Federal Rule of Evidence 403. The Supreme Court of Virginia found state <u>habeas</u> claim 16 procedurally barred under <u>Slayton</u> because the claim could have been, but was not, raised on appeal.

Shell's related appellate claim focused on alleged shortcomings in the Commonwealth's chain of custody of digital images from Shell's camera, arguing that the possibility that the evidence had been altered or tainted required suppression of the evidence pursuant to Virginia law. Shell fails to rebut the presumption that the state court's finding of default is correct, and thus, federal Claims 13 and 15 are also procedurally defaulted. <u>See</u> <u>Stockton</u>, 41 F.3d at 924 (finding that state court's application of <u>Slayton</u> bar is entitled to presumption of correctness).

## C. Cause, Prejudice, and Fundamental Miscarriage of Justice

A court may not review a procedurally defaulted claim unless petitioner demonstrates either (1) cause for default and actual prejudice, or (2) a fundamental "miscarriage of justice" due to petitioner's actual innocence. <u>Wolfe v. Johnson</u>, 565 F.3d 140, 160 (4th Cir. 2009). The court concludes that Shell fails to show cause and prejudice or establish his actual innocence in order for the court to consider procedurally barred Claims 1, 4, 5, 6, 7, 8(b)-(c), 10, 11, 12, 13, 14, 15, 16, 17, and 18.[4]

### 1. No Cause and Prejudice.

To show cause, petitioner must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule," by showing

---

[4] Shell need not show cause as to Claims 2, 3, 8(a), and 9, because he properly exhausted these claims under § 2254(b). Shell does not attempt to argue cause for his default of Claims 13 and 15. The court does not need to address whether Shell has shown the level of prejudice for the Claims for which he failed to establish cause. <u>United States v. Frady</u>, 456 U.S. 152, 170 (1982).

8

"that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable. . . ." Murray v. Carrier, 477 U.S. 478, 488 (1986) (internal quotation marks and citations omitted). Petitioner "cannot establish cause to excuse his default if he should have known of such claims through the exercise of reasonable diligence" in time to bring them properly before the state court. Stockton, 41 F.3d at 925. An error by counsel may serve as cause, but only if petitioner demonstrates (1) that the error was so egregious that it violated petitioner's constitutional right to effective assistance of counsel, and (2) that the ineffective assistance claim itself is exhausted and not procedurally defaulted. Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000).

### a. Claim 1

When the Commonwealth moved to admit a laboratory analyst's certificate of analysis showing the presence of morphine in the bottle Shell allegedly gave to police, defense counsel argued that Shell had a right to cross examine the analyst, Vickie Miller. The court admitted the certificate subject to defense counsel being allowed to cross examine Miller later in the case. (Pet. Mem. Sup. 10-22.) Shell asserts in Claim 1 that the trial court erred by allowing the Commonwealth to rest its case without calling Miller, although the prosecution had subpoenaed her to testify. (Am. Pet. 43.)

Shell argues that the legal basis for Claim 1 was not available to counsel because the claim is based on court decisions that were issued after his conviction.[5] This argument fails

---

[5] See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 (2009) (holding that analyst's written attestation to blood test results constitutes a testimonial statement and defendant has right to confront analyst at trial); Grant v. Commonwealth, 682 S.E.2d 84, 89 (Va. Ct. App. Sept. 1, 2009) (holding under Melendez-Diaz that admission of a certificate of analysis over the objection of the defendant constituted a violation of the Confrontation Clause). These decisions were issued after Shell's conviction but while his direct appeal was still pending. Shell does not allege that counsel provided ineffective assistance by failing to seek permission to amend his appeal to add a Confrontation Clause claim pursuant to Melendez-Diaz.

9

because, as Shell admits, counsel raised a Confrontation Clause objection under then-existing law, which the Court recognized as having merit. Shell also argues that counsel was ineffective for failing to notice and object to the absence of Miller's testimony. This court already determined that Shell failed to present this claim of ineffective assistance, which is Claim 8(b), to the Supreme Court of Virginia and, consequently, Claim 8(b) is procedurally defaulted. Because Shell fails to demonstrate cause for failing to raise this claim to the state court, Claim 8(b) cannot constitute cause to excuse default of Claim 1. Even if Shell could show cause for his default, he has not made the requisite showing of prejudice. Without a specific showing of what Miller's missing testimony would have revealed, Shell cannot demonstrate that the inability to cross examine Miller about the certificate of analysis "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Frady, 456 U.S. at 170. Accordingly, Shell's procedural default bars review of the merits for Claim 1.

### b. Claim 4

Shell attempts to show cause for defaulting Claim 4 based on the following events. Shell alleges that during trial, when Jeff Harless testified for the Commonwealth and identified himself as the EMS technician who first responded to the scene on June 3, 2003, Shell recognized that Harless was not the individual he remembered as the first EMS responder. In the days after his conviction in September 2007, Shell allegedly recognized the first EMS responder among the inmates at the New River Valley Regional Jail where Shell was confined.[6] Shell learned the inmate's name, Austin Wickline, but did not have a chance to talk to Wickline. In March 2009, prison officials transferred Shell and Wickline to Pocahontas State Correctional Center and housed them in the same pod. Shell and Wickline talked about Shell's case, and Wickline executed an affidavit that Shell submitted in support of the state habeas petition. Wickline stated

---

[6] Shell does not explain why Wickline is incarcerated.

10

that when he arrived three minutes before other EMS workers and took Shell's place doing CPR on Franklin, Wickline "judged it likely that [Franklin] could be revived because there was no sign of blueness in her lips." In Claim 4, Shell contends that the Commonwealth committed a discovery violation by failing to disclose to the defense Wickline's conversation with the 911 dispatcher and that Wickline's testimony at trial would have contradicted the Commonwealth's theory that Franklin had been dead for some time when rescue personnel arrived.

Shell argues that he has shown cause for his default of Claim 4, because the factual basis of the claim was not available to him during trial and that he could not contact his attorney with the necessary information to add this claim to the appeal brief. These arguments cannot excuse Shell's default of any portion of Claim 4. By his own admission, Shell knew during trial that Wickline had been among those who responded to the 911 call, per Commonwealth trial exhibit 18, and because Shell recognized that Harless was not the first EMS technician to arrive, as Harless testified. Yet, Shell failed to present this fact to his attorney or to the court during trial, in a motion for new trial, or on appeal to timely develop this evidence about Wickline. Because Shell "should have known of [the Wickline] claim[] through the exercise of reasonable diligence" in time to present it earlier to counsel and to the state courts, he is not excused from default under Slayton, the basis on which the Supreme Court of Virginia dismissed state habeas claim 7. Moreover, Shell clearly knew the facts necessary to raise his discovery claim about Wickline in the state habeas petition, but he offers no valid reason for failing to do so. Therefore, the court finds that Shell fails to show cause to excuse default of Claim 4.

### c. Claims 10-12 and 16.

Shell argues in Claim 11 that VDOC officials' prevented him from accessing the nude images of the victim and voluminous transcripts of the multi-day trial to prepare his state and

11

federal <u>habeas</u> petitions while incarcerated.[7] Shell further argues in Claim 11 that Supreme Court of Virginia's Rule 5:7(a)(6), which limits <u>habeas</u> petitions to fifty pages, is an arbitrary and capricious rule that denied him the ability to present all the <u>habeas</u> claims now considered unexhausted.

Shell's first state <u>habeas</u> petition exceeded fifty pages. The Supreme Court of Virginia returned Shell's initial state <u>habeas</u> petition with a letter, stating that the petition exceeded the fifty-page limit under Rule 5:7(a)(6) and that Shell could either file an amended petition that met the page limit or file a motion for leave to exceed the page limit.[8] (Pet'r's Second Resp. to Resp't's Mot. to Dismiss (ECF No. 27) Ex. B.) Shell offers no viable reason for his failure to move for leave to exceed the page limit under Rule 5:17(a)(6). Instead, Shell filed a 45-page amended <u>habeas</u> petition raising 22 claims. Shell also fails to offer any viable reason for his alleged inability to present his state <u>habeas</u> claims within the fifty-page limit.[9] Moreover, Shell fails to explain how lack of access to the transcripts or specific nude images prevented him from fairly presenting any claim to the Supreme Court of Virginia. Thus, Shell cannot rely on Rule 5:7(a)(6) or the VDOC's security precautions as cause to excuse his default of Claims 10, 11, 12, and 16.

---

[7] Shell alleges that the VDOC officials told him that he could not keep so many materials in his cell at once, and the lascivious, nude images of female bondage and genitalia would constitute contraband.

[8] Rule 5:7(a)(6) provides that a Justice of the Supreme Court of Virginia may authorize a petitioner to exceed the fifty-page limit.

[9] The Supreme Court of Virginia letter advised Shell, "You should take into consideration the fact that the Court very rarely grants such motions," referring to motions seeking authorization to exceed the page limit. (Pet'r's Second Resp. to Resp't's Mot. to Dismiss (ECF No. 27) Ex. B.) Shell interpreted this warning as (1) an indication that he could not file both an amended petition and a motion seeking to exceed the page limit, and (2) the Court's attempt to discourage him from filing such a motion. Shell claims that he could not adjust the statements of his claims to fit the fifty-page limit, because he did not have access to a computer and had difficulty gauging how many pages each argument would require when using a typewriter or handwriting. Finally, Shell blames his lack of legal training. These excuses rest on Shell's own choices and do not describe any true impediment that prevented him from succinctly presenting his arguments to the Supreme Court of Virginia within fifty pages.

### d. Claims 5-7 and 8(b)-(c)

Shell attempts to show cause to excuse default of Claims 5, 6, and 7 by alleging in Claim 8(c) that counsel was ineffective in failing to raise Claims 5, 6, and 7 on appeal. Because Shell did not present Claims 8(b) and (c) to the Supreme Court of Virginia, Claims 8(b) and (c) are unexhausted, but procedurally defaulted under the state bar against successive habeas petitions. See supra (stating Claim 11 and Rule 5:7(a)(6) do not constitute cause to excuse a procedural default). Consequently, Claim 8(c) cannot serve as cause to excuse the default of Claims 5-7. See Edwards, 529 U.S. at 452 (finding defaulted ineffective assistance claim cannot serve as cause).

### e. Claims 12, 14, and 17-18

Shell asserts that he could not raise Claims 12, 14, 17, and 18 on appeal, because he had no way to contact counsel during preparation of the appeal briefs. Shell alleges that counsel's telephone system did not accept inmate calls and that counsel did not respond to Shell's letters. Shell fails to demonstrate, however, that his lack of contact with counsel prevented counsel from raising any of the defaulted claims, as required to show cause. See Murray, 477 U.S. at 488 (cause requires showing of "objective factor external to the defense [that] impeded counsel's efforts"). Moreover, Shell has not argued an independent federal habeas claim that his attorney's representation during the appeal was constitutionally ineffective, so he cannot rely on counsel's alleged acts or omissions during the appeal as cause to excuse default.[10] Edwards, 529 U.S. at 452; see also Jones, 463 U.S. at 751-52 (holding the selection of issues to address on appeal is left to the discretion of appellate counsel and counsel need not address every possible issue on

---

[10] Shell alleged in state habeas claim 21(e) that counsel was ineffective for failing to stay in touch with Shell during appeals. The Supreme Court of Virginia found this claim to be without merit under Strickland v. Washington, 466 U.S. 668, 687 (1984), and Jones v. Barnes, 463 U.S. 745, 751-52 (1983). (Mot. to Dismiss Ex. H, p. 7.)

13

appeal).  Accordingly, petitioner fails to establish cause to excuse procedurally defaulting Claims 12, 14, 17, and 18.[11]

## 2.  No Fundamental Miscarriage of Justice

A district court determines the merits of all procedurally defaulted claims if it finds a fundamental miscarriage of justice exists because the petitioner is actually innocent.  Teleguz v. Pearson, 689 F.3d 322, 329 (4th Cir. 2012).  "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new [and reliable] evidence [not presented at trial], it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  House v. Bell, 547 U.S. 518, 536-37 (2006).  A "credible" actual innocence claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial[.]"  Id. at 537 (quoting Schlup v. Delo, 513 U.S. 298, 324 (1995)).  In deciding whether the petitioner has made a "substantial showing" of actual innocence that warrants an evidentiary hearing, the court need not "test the new evidence by a standard appropriate for deciding a motion for summary judgment" but may "consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."  Schlup, 513 U.S. at 321-22.

> [T]he habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. . . . [T]he court must make a probabilistic determination about what reasonable, properly instructed jurors

---

[11] Furthermore, Shell argued in Claim 12 that the medical examiner's testimony regarding Franklin's time of death was speculative and unsupported by evidence.  Shell bases this claim, in part, on "new" opinion evidence Shell gathered after conviction about the length of time necessary for ligature marks to fade.  (Am. Pet. Ex. L & M.)  Because Shell offers no reason why he or counsel could not have developed such evidence "through the exercise of reasonable diligence" in time to present Shell's current arguments during trial or appeal, Shell's "new" evidence cannot serve as cause to excuse default of Claim 12 on appeal.

14

would do. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.

Bell, 547 U.S. at 538 (omitting internal quotations and citations).

After arguing bases to find cause and prejudice to excuse procedural default, Shell noted in a handwritten portion of the amended petition, "Additionally, Petitioner asserts that he is actually innocent of all charges." Shell's reliance on such a bare assertion is not sufficient to carry his burden of persuasion to excuse procedurally defaulting Claims 1, 4, 5, 6, 7, 8(b)-(c), 10, 11, 12, 13, 14, 15, 16, 17, and 18.

Shell presents excerpts from an article by Dr. Steven B. Karch, M.D., about post-mortem diffusion of drug concentrations in a victim's blood, which concluded, "Decisions based on concentrations measurements made in a single postmortem blood specimen can be mistaken."[12] (Am. Pet. 8.) Shell also references exhibits attached to the original and amended federal habeas petitions that include documents not presented at trial which also arguably bear on the finding of guilt.[13] Even after reviewing the Dr. Karch's quoted text and attached exhibits and after considering them along with all other evidence in the record, the court finds that a jury reviewing such evidence would more likely than not still find petitioner guilty beyond a reasonable doubt. Accordingly, Shell fails to establish a fundamental miscarriage of justice, and the court will not review the merits of Claims 1, 4, 5, 6, 7, 8(b)-(c), 10, 11, 12, 13, 14, 15, 16, 17, and 18.

---

[12] Shell does not provide the court a copy of the article although he allegedly quotes it.

[13] Shell's exhibits A-F and J are certificates of analysis and police or hospital records. Other exhibits relate to the trial court's legal rulings concerning destruction of untested evidence, suppression of evidence, and discovery: Exhibit K is a note from the victim's father that granted permission for police to search the victim's apartment; Exhibit N is an email dated April 30, 2010, about general practices in the Richmond, Virginia, medical examiner's office for handling and storage of evidence related to a criminal case; and Exhibit Q is a page of contact information of people interviewed during the investigation of the victim's death. Exhibits K, N, and Q have no bearing on Shell's guilt. Thus, Exhibits A-F, J-K, N, and Q do not qualify as "new evidence" of actual innocence under Schlup to excuse procedural default. 513 U.S. at 324.

15

Exhibit G includes news articles about a woman from California who was cleared of murder in April 2008 by toxicology tests conducted on tissue samples not tested before her trial in 2007. Exhibit H consists of hand-drawn pictures of molecules of dextromethorphan, levomethorphan, and morphine. Exhibit I is Austin Wickline's affidavit that states he was the first EMS worker at the scene, he believed Franklin could be revived because her lips were not blue, and Shell handed him a "dropper bottle with lid" that Wickline put in the pocket of fellow EMS worker, Jeff Harless. Exhibit L consists of a letter from Dr. Cyril H. Wecht, M.D., J.D., dated February 8, 2008, about ligature marks and articles about Dr. Wecht's personal and professional history. Exhibit M is an email from Shell's friend about results of her self-conducted experiment to see how long ligature marks lasted on her body after she untied ropes from her thighs.[14]

Dr. Karch's text and exhibits G, H, L, and M do not constitute "new" evidence not previously available and are merely "a different spin" of evidence presented at trial. See Stewart v. Angelone, No. 97-26, 1998 U.S. App. LEXIS 10886, at *11, 1998 WL 276291, at *4 (4th Cir. 1998) (unpublished) (citing Bannister v. Delo, 100 F.3d 610, 618 (8th Cir. 1997) ("[P]utting a different spin on evidence that was presented to the jury does not satisfy the requirements set forth in Schlup."). The California woman's experiences are not probative of Shell's innocence, and her successful argument about contaminated biological samples was also available to Shell before trial. The molecular structures of dextromethorphan, levomethorphan, and morphine were similarly available at trial and are not "new" evidence. Dr. Wecht's preliminary conjecture about ligature marks is not reliable and carries little persuasive weight, and, as his biographies establish, he was available as an expert witness at the time of Shell's trial. Shell's friend's

_____

[14] Shell attached Exhibits G, H, I, and M to his habeas petition in the Supreme Court of Virginia. Shell presented only the first page of Exhibit L, Dr. Wecht's letter, to the Supreme Court of Virginia.

unscientific experiment with self-inflicted ligature marks is similarly unreliable and not so persuasive as to overcome conclusions about the victim's ligature marks by William Massello, the Medical Examiner who performed the victim's autopsy. Richard McGarry, Shell's expert witness who is a toxicology consultant, registered pharmacist, and former forensic toxicologist for the Commonwealth of Virginia, testified at length how morphine "blood concentrations alone can be sort of misleading. . . . In this particular case, you really don't know just from looking at the blood concentration of morphine whether . . . this is sufficient to have caused death. . . ." (Tr. 2193:2-7, 2210:5-7, 2211:10-13.) McGarry explained to the jury that the risk of distorted levels of morphine in heart blood concentrations would have been avoided by testing the destroyed samples, the same position Shell relies on from Dr. Karch's article. Even if the alleged scientific opinion by Dr. Karch was also presented at trial, this position was rebutted by Massello, who said that heart blood is as sufficiently accurate to test for morphine as blood from other tissue. (Tr. 1701-03.) Thus, Dr. Karch's opinion was not "new evidence" and, regardless, probably would not have changed a juror's finding of guilt.

Although Wickline's affidavit (Ex. I) may qualify as new evidence, Wickline's averments do not satisfy Schulp because testimony about the victim's color was already conflicting to some extent. Wickline avers that the victim was not breathing, "cool to the touch," and had "no sign of blueness in her lips[.]" (Wickline Aff. 1.) Harless, the first dispatched EMS technician to arrive at Shell's apartment, testified that he found the victim pulseless, apneic, bluish, cool to the touch, and not breathing. (Tr. 1064:16-17, 1066:9, 1067:2-15.) Charles Coffelt, the second dispatched EMS technician to arrive at Shell's apartment, testified that the victim was "very pale," and he did "not recall" anything about the color of her lips. (Tr. 918:17-18.) Massello testified that a body begins turning blue before death and cannot be readily

diagnosed after death because all bodies lose oxygen after death. (Tr. 1649:4-10.) Nonetheless, Wickline, Coffelt, Harless, and Massello all concluded the victim was not breathing and sans heartbeat when the EMTs arrived. Furthermore, Wickline, a convicted felon, made the affidavit years after the crimes. Thus, Wickline's statements are less reliable and persuasive than Harless' testimony, which in combination with Massello's testimony about the time stamps of photos and ligature marks on the corpse, supports the conclusion that Shell performed sexual acts after the victim died. (Tr. 1658-59, 1661-63, 1714-17.) Accordingly, Wickline's affidavit would not make it more likely than not that a reasonable juror would not have found petitioner guilty beyond a reasonable doubt.

## III

### A. Standard of Review for Claims Adjudicated by the Supreme Court of Virginia

"[S]tate courts are the principal forum for asserting constitutional challenges to state convictions." Harrington v. Richter, 562 U.S.__, __, 131 S. Ct. 770, 787 (2011). A federal court may not grant a writ of habeas corpus based on any claim that a state court decided on the merits unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). The federal habeas court's review of the state court's judgment for reasonableness is limited to "the record before the state court," in reference to United States Supreme Court "precedents as of the time the state court

18

renders its decision." Cullen v. Pinholster, 562 U.S.__, __, 131 S. Ct. 1388, 1398 (2011) (omitting internal quotations and citations). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington, 562 U.S. at __, 131 S. Ct. at 786 (omitting citations).

## B. Claims 2 and 3: Destruction of Evidence

"[W]hen the State suppresses or fails to disclose material exculpatory evidence, the good or bad faith of the prosecution is irrelevant: a due process violation occurs whenever such evidence is withheld." Illinois v. Fisher, 540 U.S. 544, 547 (2004) (citing Brady v. Maryland, 373 U.S. 83 (1963); United States v. Agurs, 427 U.S. 97 (1976)) (emphasis added). A different standard applies when the state fails to preserve potentially exculpatory evidence. Id. Where state officials fail to "preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant[,]" their actions do not violate due process "unless a criminal defendant can show bad faith on the part of the [officials]."[15] Id.; see Arizona v. Youngblood, 488 U.S. 51, 58 (1988) (finding no bad faith where the failure of officials to preserve evidence "[could] at worst be described as negligent"); United States v. Bakhtiar, 994 F.2d 970, 975 (2d Cir. 1993) (stating that proof of due process violation arising from destruction of potentially exculpatory evidence requires higher standard of bad faith than showing state's system of evidence preservation was unreliable). The requirement that a defendant show bad faith applies regardless of discovery

---

[15] See also California v. Trombetta, 467 U.S. 479, 488-89 (1984) (finding failure to preserve evidence presents constitutional violation only where "exculpatory value . . . was apparent" before destruction and "defendant would be unable to obtain comparable evidence by other reasonably available means," but finding no violation where officials acted "in good faith and in accord with their normal practice" and with "no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence").

19

requests made for the evidence before officials destroyed it and regardless of the centrality of that evidence to the petitioner's defense or the prosecution's case in chief. Fisher, 540 U.S. at 548-49.

Shell contends in Claim 2 that the medical examiner's pretrial destruction of autopsy samples and prescription pill bottles and their contents deprived Shell of due process. Shell contends in Claim 3 that the Commonwealth's toxicology report should have been suppressed because the medical examiner destroyed the autopsy samples. Shell speculates that testing or retesting the destroyed autopsy samples and pill bottle contents would have resulted in exculpatory evidence. Shell also speculates that testing only some of the autopsy samples may have skewed the test results and that the untested pills may have been illegal substances manufactured to look like legal prescription tablets.

> In addressing these claims, the Court of Appeals found the following facts:
>
> On June 2, 2003, Marion Franklin died of an apparent drug overdose which occurred at appellant's photographic studio. During a June 4, 2003 autopsy, samples of heart blood, vitreous humor, gastric contents, bile, and urine were collected from Franklin's body. Only the vitreous humor and heart blood samples were tested. Both showed high levels of morphine, cocaine, and other drugs. All samples were returned to the medical examiner and were destroyed prior to trial without further testing and without notice to the court, the Commonwealth, or appellant.
>
> Six pill vials were collected from Franklin's apartment and were also destroyed without having been tested.

(Resp't's Ex. A, p. 1). The Court of Appeals ruled:[16]

> "Unless appellant can show bad faith on the part of the [police], or that the missing evidence would be exculpatory, failure to preserve potentially relevant evidence does not constitute a denial of due process." Galbraith v.

---

[16] On direct appeal, the Supreme Court of Virginia rejected Shell's petition for appeal without discussing the issues. This court looks through that summary decision to the Court of Appeals of Virginia's detailed rulings on Shell's appellate claims and presumes that the Supreme Court of Virginia dismissed the petition for the same reasons. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Bennett v. Angelone, 92 F.3d 1336, 1343 (4th Cir. 1996).

<u>Commonwealth</u>, 18 Va. App. 734, 739, 446 S.E.2d 633, 636 (1994) (citing
<u>Arizona v. Youngblood</u>, 488 U.S. 51, 58 (1988)).

In this case, appellant makes several allegations of bad faith on the part of the
police and Commonwealth's Attorney's office. However, none of the allegations
pertain to the handling or destruction of the evidence at issue on appeal. In fact,
the medical examiner testified that it was their normal procedure to destroy
autopsy samples, both tested and untested, and other testable evidence submitted
to them one year after receipt. Appellant's reliance on [Virginia] Code §§ 2.2-
1106 and 2.2-1107, to demonstrate this procedure is unlawful, is misplaced.
Those sections address only the disposal of hazardous materials rather than the
type of evidence at issue in this case. Moreover, the record contains no evidence
of bad faith on the part of the police. Indeed, the undisputed evidence at trial
demonstrated that the medical examiner's office destroyed the evidence according
to their routine procedure. There was no evidence that there was any intent or
conscious effort on the part of the police to destroy exculpatory evidence.

Likewise, appellant fails to show that the destroyed evidence would have been
exculpatory. The tested samples fully established the cause of Franklin's death.
Likewise, the pills collected from Franklin's apartment were identified prior to
destruction as legal medications.

Based on the evidence appellant "can assert no more than the mere possibility that
further testing could have exculpated him," which is not enough to establish a due
process violation. <u>Lovitt v. Warden</u>, 266 Va. 216, 242, 585 S.E.2d 801, 816
(2003) (citing <u>Youngblood</u>, 488 U.S. at 58 n.*). Because the record does not
show any bad faith on the part of the police or that further testing of the samples
would have been exculpatory, we cannot say the failure to preserve the samples
constituted a denial of due process. Consequently, we hold the trial court did not
err in denying appellant's motion to dismiss the indictments.
* * *
Appellant also argues the trial court erred in admitting the forensic toxicology
report. In support of this question presented, he reiterates his argument set forth
above regarding the destruction of the samples obtained during the autopsy.

Nothing in the record indicates the tested samples were unreliable. The fact that
other items were not tested has no bearing on the authenticity or accuracy of the
samples that were tested.

"The admissibility of evidence is within the broad discretion of the trial court, and
a ruling will not be disturbed on appeal in the absence of an abuse of discretion."
<u>Blain v. Commonwealth</u>, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988). We
find no abuse of discretion in the court's admission of the toxicology report.

(Mot. to Dismiss Ex. A, pp. 2-4.)

21

The court concludes that the Court of Appeals' adjudication of Shell's Claims 2 and 3 was neither contrary to nor an unreasonable application of federal law and was not based on an unreasonable determination of the facts in the state court record. The trial record did not support a finding that the destroyed samples and pills "possess[ed] an exculpatory value that was apparent before it was destroyed," as required for a due process claim. Trombetta, 467 U.S. 479, 488-89. Richard McGarry, the former forensic toxicologist called as a defense witness, testified that all the autopsy samples were important for a complete picture of the manner of the victim's death, but he could not say whether test results from all the samples would have supported the defense or the prosecution. (Tr. 2191:16-21, 2211:16-21.) McGarry also testified that the victim died from morphine and that the level of that drug in her heart blood was double the average overdose level. (Tr. 2253:10-18, 2270:6-14.) Trial testimony supported the Court of Appeals' finding that examiners visually identified the pills in the vials from Franklin's apartment as innocent, over-the-counter medications and decided that testing the chemical makeup of the pills was unnecessary. (Tr. 1709-12.)

Because the record indicates that the destroyed samples were, at best, "potentially exculpatory," this evidence falls squarely under the Youngblood standard rather than under Brady. Fisher, 540 U.S. at 547-48. Thus, Shell must show that officials acted in "bad faith" in disposing of those samples. Id.

Shell attempts to show bad faith by pointing to state statutes now in effect that set procedures to be followed before destroying evidence related to court proceedings and that allow

22

a defendant to move for the preservation of evidence.[17]  See Va. Code Ann. § 9.1-1106

(authorizing the Department of Forensics to dispose of certain hazardous materials) (effective

July 1, 2005), § 9.1-1107 (authorizing the Department of Forensics to dispose of certain other

property after analysis) (effective July 1, 2005), § 19.2-270.4:1 (describing the storage,

preservation, and retention of human biological evidence in felony cases).  Shell asserts, as he

did on appeal,[18] that Massello, the medical examiner, could not have a "normal practice" that

violates state statutes and that Massello should have notified the police, the court, the

Commonwealth's Attorney, and Shell before destroying the evidence.  Shell also points to the

fact that the Commonwealth destroyed the samples and pills after Shell had stated his intent to

have them tested, thus frustrating his statutory right to do so.  See Va. Code Ann. § 19.2-327.1

(describing procedures for a convicted felon' motion for scientific analysis of newly discovered

or previously untested scientific evidence).

---

[17] Shell also asserts that destruction of the samples and pills in his case was contrary to the
finding of a Legal Opinion issued by the Attorney General of Virginia on October 31, 2003.  Op. Va.
Att'y Gen., No. 03-094, 2003 Va. AG LEXIS 47, 2003 WL 22680745 (2003).  In response to an inquiry
about how long a circuit court clerk must maintain human biological evidence in a non-capital case when
a defendant did not make a motion to preserve human biological evidence, the Attorney General
concluded that "[t]he court may order the donation or destruction of human biological evidence received
in a criminal case on appeal after all appellate remedies have been exhausted."  Id.  In Shell's case,
however, the Court did not order the destruction of the autopsy samples or the pill bottle contents.

[18] On direct appeal, Shell cited officials' deviation from normal procedure by failing to test all the
autopsy samples as evidence of bad faith that supported suppression of the toxicology report.  Shell now
also argues that officials performed complete testing only on one of the autopsy samples, contrary to the
Court of Appeals of Virginia's statement of the facts, and that the type of testing performed could not
have definitively isolated the drug identified in the test results.  Shell further argues that the Court of
Appeals of Virginia misconstrued his claim, did not fully analyze the evidence, and misinterpreted state
law.  However, this court does not have appellate jurisdiction over the Court of Appeals of Virginia and
does not determine whether the Court of Appeals of Virginia should have construed Shell's appellate
claim differently.  "[F]or a federal court to hold that a state court had the opportunity to rule on a
constitutional claim as to which no ruling was requested, and then to rule on the merits of the claim itself,
would undermine the very considerations of comity that the rules of exhaustion were designed to protect."
Mallory v. Smith, 27 F.3d 991, 996 (4th Cir. 1994) (quoting Grey v. Hoke, 933 F.2d 117, 120 (2d Cir.
1991)).  Furthermore, federal habeas relief is not available to correct interpretations of state law that do
not implicate any federal right.  See 28 U.S.C. § 2254(a) (stating habeas relief available only to correct
violations of federal law); Hailey v. Dorsey, 580 F.2d 112, 115 (4th Cir. 1978) ("Matters of state law not
involving federal constitutional issues are not appropriate grounds for federal habeas corpus relief.").

23

None of Shell's proffered evidence or argument supports a finding of bad faith related to the destruction of the autopsy samples and pills, as required to prove his due process claims under <u>Youngblood</u>. 488 U.S. at 58. Shell cites no precedent establishing that a finding of bad faith can rest on officials' negligent failure to comply with a state statute regarding preservation of evidence. <u>See Youngblood</u>, 488 U.S. at 58 (finding no bad faith where the failure of officials to preserve evidence "[could] at worst be described as negligent"); <u>Trombetta</u>, 467 U.S. at 488-89, 491 n.12 (limiting constitutional duty to preservation of material exculpatory evidence even if a state statute sets different duty). Shell simply fails to demonstrate any respect in which "the Government intentionally [acted] to gain some tactical advantage over [the defendant,]" <u>Youngblood</u>, 488 U.S. at 57 (citation and internal quotations marks omitted), or destroyed the samples and pills out of "official animus towards [Shell] or . . . a conscious effort to suppress exculpatory evidence[,]" <u>Trombetta</u>, 467 U.S. at 488.

### C. Claim 8(a): Ineffective assistance of counsel

Shell argued in his state <u>habeas</u> petition that counsel was ineffective for not citing Virginia Code § 19.2-270.4:1 and § 19.2-327.1 and the Legal Opinion issued by the Attorney General of Virginia on October 31, 2003. <u>See supra</u> note 15 (discussing the Legal Opinion of the Attorney General of Virginia). The Supreme Court of Virginia determined that, <u>inter alia</u>, counsel's decisions as to what issues to argue on appeal were entitled to deference and did not constitute ineffective assistance. The Court's adjudication of this claim was neither contrary to nor an unreasonable application of federal law and was not based on an unreasonable determination of the facts in the state court record. As already discussed, the Attorney General's Legal Opinion had no bearing on Shell's case because the trial court was not involved with the destruction of evidence. Virginia Code § 19.2-270.4:1 discusses the preservation of evidence

24

upon the motion of a person convicted of a felony or his counsel, and Virginia Code § 19.2-327.1 discusses the preservation of new or previously untested scientific evidence upon the motion of a person convicted of a felony or his counsel. Neither statute applied to Shell's case because the biological and pharmaceutical evidence was destroyed before Shell was convicted. Thus, Shell cannot establish either counsel's deficient performance or resulting prejudice for not making these arguments. See Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984) (requiring a petitioner to establish counsel's deficient performance and resulting prejudice to state a violation of the Sixth Amendment).

## D. Claim 9: Cumulative Error

Shell argued in state habeas claim 22 that the other 21 state habeas claims, which described violations of the Fourteenth Amendment right to due process and the Sixth Amendment right to the effective assistance of counsel, warranted vacating his convictions. The Supreme Court of Virginia treated state habeas claim 22 as one limited to the cumulative ineffectiveness of counsel because the Court dismissed the other state habeas claims as procedurally barred. The Court held that the cumulative error claim was meritless because Shell failed to establish a Sixth Amendment deprivation of effective counsel, and thus, counsel's cumulative alleged errors could not warrant vacating the convictions. (Resp't's Ex. H, p. 8). The Court's adjudication of this claim was neither contrary to nor an unreasonable application of federal law and was not based on an unreasonable determination of the facts in the state court record. See, e.g., Strickland, 466 U.S. at 687-88, 694 (requiring a petitioner to establish counsel's deficient performance and resulting prejudice to state a violation of the Sixth Amendment).

25

Shell similarly complains in Claim 9 that the alleged violations of federal law described in the federal habeas petition cumulatively warrant vacating his convictions. For the reasons already discussed, all Claims except 2, 3, 8(a), and 9 are not properly before this court, and Shell cannot rely upon them to argue a "cumulative" violation of federal law. Furthermore, the court determined that Claims 2, 3, and 8(a) do not warrant granting habeas relief, and thus, no cumulative error exists. Accordingly, Claim 9 does not entitle petitioner to relief.

## IV

In conclusion, the court finds that the motion to dismiss must be granted because Shell's § 2254 claims are procedurally defaulted or do not entitle him to federal habeas relief. An appropriate order will issue this day.

Petitioner is advised that he may appeal this decision, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, if a judge of the United States Court of Appeals for the Fourth Circuit or this court issues a certificate of appealability, pursuant to 28 U.S.C. § 2253(c). A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Id. § 2253(c)(1). The court finds that petitioner has failed to demonstrate "a substantial showing of the denial of a constitutional right" and therefore, the court declines to issue any certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. See Miller-El v. Cockrell, 537 U.S. 322 (2003); Slack v. McDaniel, 529 U.S. 473 (2000). If petitioner intends to appeal and seek a certificate of appealability from the United States Court of Appeals for the Fourth Circuit, his first step is to file a notice of appeal with this court within 30 days of the date of entry of this memorandum opinion and the accompanying order, or within such extended period as the court may grant pursuant to Rule

4(a)(5). The Clerk is directed to send copies of this memorandum opinion and accompanying order to the petitioner and to counsel of record for the respondent.

**ENTER**: This _30th_ day of September, 2012.

_____
Chief United States District Judge